UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JAMES BARRETT, III,** | Civ. No. 12-6259 (KM)(SCM) |
| **Plaintiff,** | OPINION |
| v. | |
| **WALGREENS INC.; JOHN DOES (1-10); ABC CORP. (1-10); ANTHONY VILLAR** | |
| **Defendants.** | |

This case arises out of an allegedly false accusation of assault in the workplace. Anthony Villar reported to his employer that his supervisor, plaintiff James Barrett III, had struck him. The employer, defendant Walgreens Inc., was unable to substantiate Villar's allegations. Walgreens nevertheless elected to transfer Barrett out of his usual store. That transfer, Barrett alleges, made his job far less desirable: his new assignment offered fewer hours, provided less job security, and required him to work in a more dangerous neighborhood. Rather than accept the transfer, Barrett essentially stopped working for Walgreens.

Barrett, claiming that he never assaulted Villar, has sued both Villar and Walgreens. Defendants Walgreens and Villar have moved for summary judgment as to all counts, and for sanctions.

Barrett denies the assaults, and Walgreens' investigator inspected security camera footage that is inconsistent with Villar's account. That is sufficient to defeat Villar's motion for summary judgment as to the counts asserted against him: defamation (Count Four) and tortious interference with

1

economic advantage (Count Five). I will grant the motion for summary judgment, however, as to the claims asserted against Walgreens: breach of the implied covenant of good faith and fair dealing (Count One), wrongful discharge (Count Two), and violation of wage payment laws (Count Three). Walgreens' motion for Rule 11 sanctions will be denied.

## **Background**

The plaintiff, James Barrett III, worked part-time at a Walgreens store in Fort Lee, New Jersey. (Counterst.,[1] ¶ 4). At the time of the incidents in question, he was one of several assistant managers. (*Id.* at ¶ 4). He worked for Walgreens for more than two decades, but had no written employment contract. (*Id.* at ¶¶ 4, 27, 31).

One of the employees under Barrett's supervision was a store clerk named Anthony Villar. Villar testified that on several occasions Barrett mistreated him: once Barrett allegedly "yelled at" Villar, and on several

---

[1] References to the record will be abbreviated as follows:

"Barrett Dep." – Deposition of James Barrett, III, No. 20-4, Exh. A.

"Barrett Voluntary Stmt." – Voluntary Statement, Declaration of Joel L. Finger, Exh. J, No. 20-13.

"Compl." – Amended Complaint and Jury Demand, No. 11.

"Counterst." – Plaintiff's Counterstatement of Material Facts, No. 21-1.

"Def. Stmt." – Defendant's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment and for Sanctions, No. 20-1.

"Mot." – Memorandum of Law in Support of Defendants' Motin for Summary Judgment and for Sanctions, No. 20-2.

"Notice of Removal" – Notice of Removal, No. 1.

"Opp." – Plaintiff's Brief In...Opposition to Defendants' Motion for Summary Judgment, No. 21-2.

"Romero Dep." – Deposition of Franklin Romero, No. 21-4, Exh. 1.

"Villar Dep." – Deposition of Anthony Villar, No. 21-4, Exh. 2.

"Villar Letter" – Letter from Anthony Villar to Steve Johnson, dated July 18, 2012, No. 20-12, Exh. I.

2

occasions Barrett allegedly punched Villar. (Villar Dep., 11, 16-17, 22). Villar reported these incidents to Walgreens. He said, for example that he was "repeatedly punched in the arm three times by James Barrett"; that Barrett "pushed me really so violently that I felt sorry for myself"; that Villar "got punched one more time violently really hard also"; and that Barrett "punched my right shoulder down as he walked away." Things allegedly came to a head on July 12, 2012. (Villar Letter, 1-2). On that day, according to Villar, he and Barrett were working at adjacent cash registers. Barrett "moved toward" Villar "rapidly as he screamed ahhh!," then "placed his right hand around my neck and slowly moved it toward my chest, smacked me three times each time less hard and ended with soft smacks." *Id.* at 2. Barrett's actions frightened Villar: "I was actually scared to move, I thought I was going to get hurt." *Id.*

Villar described the July 12, 2012 incident, as well as the earlier ones, in a letter to his store manager, Steven Johnson. (Villar Letter). He also shared his allegations with three assistant managers, and with some members of his family. (Counterst., ¶ 15). From its Loss Prevention Department, Walgreens dispatched Franklin Romero to investigate Villar's claims. Romero's investigation did not turn up any evidence to corroborate Villar's allegations. Romero first interviewed Villar, who acknowledged that there were no witnesses to any of the alleged assaults. *Id.* at ¶ 16. Romero then interviewed Barrett, who essentially denied Villar's allegations. (Romero Dep., 30-33). Barrett did explain that "I kid around with him [illegible] but in a friendly way." (Barrett Voluntary Stmt., 1). He stated, "If I punched him in the arm it would be out of fun not harm." (Barrett Voluntary Stmt., 1). Romero also reviewed the security camera footage for July 12, 2012, and neighboring dates. He saw "no physical contact" between Barrett and Villar. (Romero Dep., 26). As Romero explained it, "nothing that was alleged regarding this punching and slapping could be substantiated by myself." *Id.*

Barrett claims that, after the investigation was conducted, Romero and Johnson said he would receive only a warning. (Counterst., ¶ 19). However, Walgreens subsequently informed Barrett that he would be transferred out of

3

the Fort Lee store. Initially, they explained, he would be assigned to a store in Fair Lawn. After a short stint there, however, Barrett would likely become a floating manager, working in different stores as needed. *Id.* at ¶¶ 18-24. Barrett claims that those stores were less desirable than his usual Fort Lee store. They offered fewer hours and little job security, or they were located in unsafe areas. *Id.* at ¶¶ 19, 21. Barrett admits that Walgreens did not explicitly terminate him and acknowledges that he accepted the reassignment to Fair Lawn. (Barrett Dep., 120; Counterst., ¶ 18). Barrett alleges, however, that the new arrangement was so unfavorable to him that he essentially stopped working at Walgreens. (Barrett Dep., 204-06).[2]

Barrett brought suit against Walgreens in New Jersey state court in August of 2012. The case was removed to federal court, and Villar was added as a defendant. (*See* ECF Nos. 1, 11).

This court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Barrett is a citizen of New Jersey. The defendants allege that Villar is a citizen of New York, and Barrett does not contest this. (Counterst., ¶¶ 1, 3). According to the notice of removal, Walgreens Inc. (properly identified as Walgreen Eastern Co., Inc.) is a New York corporation with its principal place of business in Deerfield, Illinois. (*See id.* at ¶ 2; Notice of Removal, ECF 1 at 2 ¶5). The claimed damages, though not specified, would appear to exceed $75,000. (*Id.* at 2-3 ¶6)

The currently operative amended complaint contains five counts. (ECF 11) Against Walgreens, Barrett claims breach of the implied covenant of good faith and fair dealing (Count One), wrongful discharge (Count Two), and violations of New Jersey law for failure to pay him for unused sick and vacation time (Count Three). Against Villar, Barrett makes two claims: defamation (Count Four) and tortious interference with economic advantage (Count Five).

---

[2]   According to Barrett, Walgreens had trouble finding him shifts that did not conflict with his full-time job at another company. *Id.* at 78-80. Walgreens offered Barrett a position in Paterson, New Jersey, but he turned it down, considering the area unsafe. *Id.*at 80. After that, it appears that Barrett was not assigned to any additional shifts. *Id.* at 80-82.

4

The defendants have filed a motion for summary judgment with respect to all five counts of the complaint.

## Discussion

### I. Breach of the implied covenant of good faith and fair dealing

Count One of the complaint alleges a breach of the implied contractual covenant of good faith and fair dealing. That cause of action requires an underlying contract. Barrett had no formal written employment contract with Walgreens, but alleges that they were nevertheless in a contractual relationship, for two reasons.

First, Barrett argues that Walgreens represented in "various writings" that it would treat employees fairly. Those representations, says Barrett, were contractual, and that contract contained an implied covenant of good faith and fair dealing. Walgreens allegedly violated that covenant when it transferred Barrett to a new store based on false allegations of assault. (Compl., ¶¶ 21-22).

Second, Barrett argues that his manager, Steven Johnson, and a manager from the Loss Prevention Department, Franklin Romero, represented to him that the only discipline he would face was a warning. That representation, Barrett argues, created a contract. When Walgreens subsequently transferred him, they breached the implied covenant of good faith and fair dealing inherent in that contract. (Opp., 52).

Neither of those theories withstands scrutiny. Summary judgment will be entered in favor of Walgreens on Count I.

#### A. Representations made in "various writings"

An implied covenant of good faith and fair dealing inheres in every contract. *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259 (N.J. 2002). That presupposes the existence of a contract of which the covenant is a part. *Id.* at 1262. One might suppose that a decades-long employment relationship would

create a contract (or implied contract) between the employer and the employee. As a matter of New Jersey law, however, one would be wrong.

In the employment context, New Jersey courts have created a default rule: Unless the parties agree otherwise, an employment relationship is at-will. Such an at-will relationship can be terminated by either party for any reason or for no reason (so long as the reason does not independently violate public policy). *See Wade*, 798 A.2d at 1258-59. Absent a contrary agreement, then, there is no contract, and no implied covenant of good faith and fair dealing, inherent in the employment relationship.

As a prerequisite to his claim of breach of the implied covenant of good faith and fair dealing, Barrett will need to show that he and Walgreens entered into an agreement that transformed his presumptively at-will employment relationship into a contractual relationship.

Barrett argues that Walgreens created such a contract by making representations to him in "various writings," including "personnel policies and procedure manuals, retirement plans, employee guidelines," and "letters of intent." (Counterst., ¶ 21). Those documents, Barrett contends, represented to Barrett that the company would treat him "fairly and equitably." (Compl., ¶ 21). And such representations, he claims, are contractual in nature. (Counterst., ¶ 21-22). Transferring Barrett to a new store and reducing his hours allegedly prevented him from performing his duties and enjoying the fruits of that contract. (Compl., ¶ 22). Walgreens thus violated the implied covenant of good faith and fair dealing inherent in that contract.

An employer's representations in a widely distributed publication like an employee manual may indeed give rise to enforceable obligations. When the manual, fairly read, provides that certain benefits are an incident of employment, an implied contract between the employer and the employee is created. *Woolley v. Hoffman-La Roche, Inc.*, 491 A.2d 1257, 1264 (N.J. 1985). And such a contract, like any other, would contain an implied covenant of good faith and fair dealing. *Wade*, 798 A.2d at 1259.

Did Walgreens' various writings make representations that an employee might reasonably construe as enforceable obligations? *Wade*, 708 A.2d at 1257. As to that question, the evidence of record does not create a triable issue.

To begin with, the "writings" introduced in the record by Barrett do not seem to promise him, as an employee, "fair and equitable" treatment. Barrett did produce a copy of Walgreens' policy on violence in the workplace (ECF 21-5, Exh. 6). But he offered that document for a different purpose, and he nowhere argues that it contains a promise giving rise to an implied employment agreement. Slightly better is Barrett's proffer of the job description of a Walgreens store manager. (ECF No. 21-5, Exh. 3). That document, Barrett points out, states that the manager should treat all team members fairly. Barrett provides no evidence, though, that *he* was ever shown that document. Nor does he demonstrate that his boss's job description set forth a benefit inherent in his own employment.

Barrett testified that he never saw any Walgreens handbook or personnel policy statement. (Counterst., ¶ 34). To the extent he may rely on them, however, they would not advance his case. Walgreens has proffered that its personnel policy documents contain a prominent disclaimer that employment is at-will, and that the benefits described therein do not create a contract. (Def. Stmt., ¶ 29-30) (quoting disclaimers displayed in a "prominent black-bordered rectangular box" stating that "[t]he policies and statements contained in this manual, and in other communications issued from time to time, are not a contract of any kind. Employment at Walgreens...may be terminated at any time, with or without cause, at the option of Walgreen Co. or the employee, and with or without warning or notice by the Company."). Such a disclaimer is sufficient to put an employee on notice that representations in the employment manual do not create a contract.

> [I]f the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract...[a]ll that need be done is the inclusion in a very prominent position of an appropriate statement that there is no

7

> promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have the absolute power to fire anyone with or without good cause.

*Woolley*, 491 A.2d at 1271 *modified*, 499 A.2d 515 (1985). Walgreens has proffered that such disclaimers appeared on all of its personnel policies, and Barrett has produced no evidence to suggest otherwise.

Finally, I find that an assurance of "fair and equitable" treatment is simply too general and vague to give rise to a claim of breach of contract under these circumstances.

Barrett has failed to raise a material issue of fact as to whether Walgreens made representations to him that created an employment contract. Without such a contract, there can be no violation of the implied covenant of good faith and fair dealing.

### B. Verbal representations

Barrett also asserts that Walgreens made verbal representations that gave rise to a contract. Franklin Romero of the Loss Prevention Department and store manager Steve Johnson allegedly told Barrett that, in response to Villar's accusation, he would receive no more than a warning. That representation, according to Barrett, was a contractual undertaking. Walgreens breached it, he says, when they imposed the more severe sanction of a transfer. (Opp., 52).

Because this is a motion for summary judgment, I will assume that Johnson and Romero did tell Barrett that he would receive only a warning. Such a statement, however, does not create a contract. The discipline to be imposed was within the employer's prerogative. The statement of Johnson and Romero is not reasonably interpreted as an "offer" that Villar could "accept" by words or conduct. In that respect, it is unlike, for example, a promise in an employment manual, where the employee is understood to agree to work for

8

the employer in exchange for the benefit. For Johnson and Romero's statement of assurance to become an enforceable obligation, there would have to be agreement, coupled with consideration, or promissory estoppel. Barrett has presented evidence of neither.

For Walgreens' promise to form a binding contract, Barrett would have to have agreed and provided Walgreens some consideration—some act or forbearance—in return. *Shebar v. Sanyo Business Systems Corp.*, 111 N.J. 276, 285 (1988). Barrett has not presented evidence of any such meeting of the minds, or of consideration. He has not testified, for instance, that he and Walgreens agreed that no disciplinary action would be taken, in return for which he promised to continue working at Walgreens. The statement by Johnson and Romero did not create a contract.

Short of a contract, a promise can create an enforceable obligation where the promissee reasonably relies on it to his detriment. That is the doctrine of promissory estoppel. See *Toll Bros. v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 944 A.2d 1, 19 (N.J. 2008). Barrett, however, has identified no actions he took or rights he gave up in reliance on Walgreens' promise. Without such reliance, and without such a detriment resulting from that reliance, there is no promissory estoppel. See *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat. Bank*, 395 A.2d 222, 230 (N.J. Super. Ct. App. Div. 1978) (defining the elements of promissory estoppel to include "(3) the promisee must in fact reasonably rely on the promise, and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise.").

Barrett has not adduced evidence that a contractual relationship existed between him and Walgreens sufficient to overcome his default status as an at-will employee. Such a contract is a prerequisite of any claim of breach of the implied covenant of good faith and fair dealing.

Walgreens' motion for summary judgment is therefore GRANTED, and judgment will be entered in favor of Walgreens on Count One.

## II. Failure to pay Barrett for unused sick and vacation time

Count Two alleges that Walgreens violated New Jersey labor law when it failed to reimburse Barrett for unused sick time and vacation time. (Opp., 55). New Jersey law requires that when an employee is terminated or resigns, the employer must promptly pay "all wages due." N.J. STAT. ANN. 34:11-4.3. Payment for unused vacation time may or may not constitute "wages" under the statute. *See Chrin v. Cambridge Hydrodynamics, Inc.*, No. A-3610-02T5, 2003 WL 25754809, at *1 (N.J. Super. Ct. App. Div. Dec. 30, 2003). I do not reach that legal issue, however, because Barrett's claim fails for lack of evidence.

With respect to unused vacation time, Walgreens presented pay stubs demonstrating that Barrett was paid for all the time he had accrued up to the end of his employment. (Opp., 8-9). Barrett has offered no evidence to the contrary. Indeed, he has admitted that he does not know whether Walgreens paid him for his unused vacation time. (Counterst. ¶ 45).

With respect to unused sick time, Walgreens proffered its contrary corporate policy. Walgreens does not pay employees for unused sick time, and it never formed any agreement with Barrett stating otherwise. (Def. Stmt., ¶ 43). Barrett has presented no contradictory evidence. Indeed, he acknowledged in his deposition that Walgreens had a policy of not paying employees who resigned or were fired for unused sick time. (Barrett Dep., 119-20).

There is therefore no genuine, material issue of fact as to whether Barrett is owed money for unused vacation or sick time. Walgreens' motion for summary judgment is therefore GRANTED, and judgment will be entered in favor of Walgreens on Count Two.

## III. Wrongful Discharge

Count Three alleges a common law claim of wrongful discharge. Barrett admits that he was not explicitly terminated (Barrett Dep. 120), but appears to be arguing that his transfer to less desirable work locations amounted to a

constructive discharge. Such a constructive discharge based on false allegations of assault, he contends, was wrongful.

I will assume without deciding that Walgreens' decision to transfer Barrett could qualify as a constructive discharge.[3] Even so, Barrett's claim that the discharge was wrongful is not supported by the evidence.

Absent a contract, employment in New Jersey is an at-will relationship, generally terminable for any reason or for no reason. *Pierce v. Ortho Pharmaceutical Corp.*, 417 A.2d 505, 508-09 (N.J. 1980). The discharge of an at-will employee may nevertheless be wrongful and actionable if it violates a clear mandate of public policy. *Id.* at 512. To identify the relevant public policy, courts are to look to legislation, administrative rules, regulations or decisions, and judicial decisions. *Id.*

Barrett has not shown that an employer violates a clear mandate of public policy when it transfers an employee based on an unproven allegation of misconduct. Walgreens proffers that its policy is to transfer the manager when a subordinate complains of mistreatment. (Def. Stmt., ¶ 19). Barrett has not argued that Walgreens' statement of its policy is inaccurate. Nor has he identified some inappropriate basis for his dismissal, for which the Villar incident was a pretext. Rather, he argues that Walgreens was wrong to believe Villar, or that it should not have transferred him absent sufficient independent proof of Villar's allegations.

Barrett suggests that there is a strong public policy, embodied in defamation law, that "individuals should generally be free to enjoy their reputations unimpaired by false and defamatory attacks." (Opp., 54). Terminating Barrett based on defamatory remarks, he argues, contravenes that public policy. Faced by an unsettled issue of state law, a federal court sitting in

---

[3] The assumption is generous. Where two employees develop an antagonistic relationship but the employer fails to uncover conclusive evidence of misconduct by either, it may legitimately conclude that the two men need to be separated. Here, the employer accomplished that by transferring the supervisor, Barrett. Even assuming the decision was arbitrary or ill-advised, it does not necessarily constitute a discharge at all, let alone a wrongful one.

diversity must predict how the State's highest court would resolve the issue. *E.g., Hunt v. U.S. Tobacco Co.,* 538 F.3d 217, 220-21 (3d Cir. 2008); *Norfolk Southern Ry. Co. v. Basell USA Inc.,* 512 F.3d 86, 91 (3d Cir. 2008).

Barrett cites no case in which a New Jersey court has found wrongful discharge based on an employer's reliance on an allegedly defamatory statement. To me, it seems unlikely that a New Jersey court would extend its common law in this way. Such a holding would require employers to adjudicate defamation claims and act as guarantors of their employees' reputations.[4] More fundamentally, such a holding would contradict the doctrine of at-will employment. To require that suspicions be proven or verified would effectively impose a requirement of termination (or transfer) for cause. Such a requirement is contrary to the central tenet of the at-will employment doctrine: that no cause is required for termination. I therefore predict that a New Jersey court would not expand the common law to recognize the cause of action that Barrett advocates.

Barrett has failed to identify a clear mandate of public policy that Walgreens violated when they terminated him (assuming they terminated him at all). There is therefore no genuine issue of fact with respect to his claim of wrongful discharge. Walgreens' motion for summary judgment is therefore GRANTED, and judgment will be entered in favor of Walgreens on Count Three.

## IV. Defamation

Barrett alleges that Villar's complaints of assault were false and defamatory. (Compl., Count Four). Damages aside, a claim of defamation has three substantive elements: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *NuWave Inv. Corp. v. Hyman Beck & Co.,* 75 A.3d 1241, 1249 (N.J.

---

[4] Indeed, Barrett as much as demands that the employer makes credibility findings in his favor. Presumably, if it did so, Villar would have a cause of action based on the employer's failure to make credibility findings in *his* favor.

12

Super. Ct. App. Div. 2013). Here, Barrett alleges that Villar falsely accused him of assault and published that false statement to Walgreens, three of its employees, and to his family. (Counterst., ¶ 15). Villar denies that the statements were false, and argues that they were in any event privileged. (Mot., 10-11). Because material issues of fact are presented, summary judgment is denied as to Count Four.

### A. Credibility clash as to the assaults

Summary judgment must be denied because Villar swears that the assaults occurred, and Barrett swears that they did not. If Villar is right, then his statements were true, and cannot be defamatory as a matter of law. If Barrett is right, then Villar's statements were false, and can be defamatory if other requirements are met.

"[C]redibility evaluations are inappropriate in deciding a motion for summary judgment." *In re APA Transport Corp. Consol. Litigation,* 541 F.3d 233, 249 n.11 (3d Cir. 2008) (quoting *Country Floors, Inc. v. P'ship Composed of Gepner and Ford,* 930 F.2d 1056, 1061 (3d Cir.1991)). "'It is axiomatic that the finder of fact must resolve such conflicts in testimony, not a court making a judgment as a matter of law.' *See, e.g., Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir.1998) ("[A]t the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder.") (citation omitted).'" *MBIA Ins. Corp. v. Royal Indem. Co.,* 426 F.3d 204, 209 (3d Cir. 2005).

Villar described assaults on July 12, 2012, and on earlier occasions. (*See, e.g.,* Counterst., ¶ 15 ("Anthony Villar made a written statement...which contained false allegations against plaintiff including but not limited to...'I was repeatedly punched three times on my right arm by James Barrett...he pushed me away violently...he placed his right hand almost around my neck.'") Villar stood by those allegations under oath at his deposition. (*E.g.,* Dep. 10-18). Villar also testified that in May or June of 2011 Barrett "yelled at" Villar (*Id.* at

11); that in December 2011 Barrett punched Villar (*Id.* at 16-17); and that in February 2012 Barrett punched Villar in the shoulder (*Id.* at 22).

Barrett generally denies ever assaulting Villar. To Mr. Romero of the Loss Prevention Department, Barrett stated:

> I kid around with him [illegible] but in a friendly way... as far I know we have a pretty good relationship as mgr and co worker. I would never do something to harm another staffer. If I punched him in the arm it would be out of fun not harm. We sometimes work [illegible] together and once again we take care of customer and sometimes joke around. I don't see an issue with that, but I guess I have to pick my battles.

(Barrett Voluntary Stmt., 1).

Barrett also cites evidence that casts doubt on Villar's account, especially as to the July 12, 2012 incident. No witnesses were present for the alleged assault on July 12, 2012. (Villar Dep., 58; Romero Dep., 18). Walgreens' investigator, Romero, reviewed security camera footage from the relevant period. (ECF No. 20-15, 3). The footage itself, curiously, is not in the record; we have only Romero's description of it. Romero "looked at the times that I was interested in that we believe these things happened and because of my prior experience in dealing with witnesses I felt it best to go back a couple of hours as well as forward a couple of hours, and I did the same with the date." (Romero Dep., 23). The surveillance footage did not substantiate Villar's accusations. (Romero Dep., 29) ("nothing that was alleged regarding this punching and slapping could be substantiated by myself."). Indeed, Romero observed "no physical contact" between Barrett and Villar. (Romero Dep., 26) ("[T]here was no physical contact that I could locate on video. And to be very specific there was no punching that I could locate on video.").

A reasonable jury could believe Barrett as to everything. Or it could credit Romero's testimony, at least as to the July 12, 2012 incident, if not the others. That is not to say, however, that a jury would be *compelled* to do so. A jury could choose to disbelieve Barrett and Romero, or simply to believe Villar. There is a genuine, material issue of fact as to the truth or falsity of Villar's

allegedly defamatory statements. Villar's motion for summary judgment will therefore be DENIED as to Count Four.

### B. Qualified privilege

For the guidance of the parties, I comment briefly on some of the issues that would arise at a trial of the defamation claim.

Villar's statements, even if false, may be protected by a qualified privilege. *Feggans v. Billington*, 677 A.2d 771, 775-76 (N.J. Super. Ct. App. Div. 1996). The applicability of the qualified privilege is a question of law for the court. *See Feggans*, 677 A.2d at 777. Depending on the context, however, its application may depend on the resolution of factual issues at trial.

In general, Villar's reports to his supervisors may be entitled to the common interest privilege. *See* Restatement (Second) of Torts § 596 (1977) (cited with approval in *Sedore v. Recorder Pub. Co.*, 716 A.2d 1196, 1208 (N.J. Super. Ct. App. Div. 1998)); *Feggans*, 677 A.2d at 774-75; *Lutz v. Royal Ins. Co. of Am.*, 586 A.2d 278, 286 (N.J. Super. Ct. App. Div. 1991).

Villar's statements to members of his own family may be privileged as statements in the interest of the recipient. *See* Restatement (Second) of Torts § 595 (1977); *Govito v. W. Jersey Health Sys., Inc.*, 753 A.2d 716, 728 (N.J. Super. Ct. App. Div. 2000); *Hunt v. Callahan*, No. A-2780-11T3, 2012 WL 5381699, at *5 (N.J. Super. Ct. App. Div. Nov. 5, 2012). Villar's family members had an interest in his well-being, *see* Restatment § 595(1)(a); a person may, without violating "generally accepted standards of decent conduct" tell his family he has been abused, *see* Restatement § 595(1)(b); and according to Villar, he did not volunteer such statements, but made them in response to questions from his family, *see* Restatement § 595(2)(a).

The qualified privilege may be lost, however, if abused. The publisher of a falsehood may lose the privilege if (1) he knows the statement is false or acts in reckless disregard of its truth or falsity; (2) the publication serves a purpose contrary to the interests of the qualified privilege; or (3) the publication is excessive. *Feggans*, 677 A.2d at 777; *Kass v. Great Coastal Exp., Inc.*, 704 A.2d

15

1293, 1294 (N.J. 1998). This is ordinarily a "question for the jury," *Feggans*, 677 A.2d at 777, applying a clear-and-convincing burden of proof, *NuWave*, 75 A.3d at 1254; *Kass*, 704 A.2d at 1294; *Govito*, 753 A.2d at 726.

Barrett alleges that Villar abused the qualified privilege by publishing his statements excessively to other supervisors and to his family, and by publishing statements he knew to be false. As discussed above, the falsity of the statements is an issue for trial. If falsity is established, Villar's knowledge of the falsity would appear to follow naturally, but that issue, too, must await trial.

### V. Tortious interference with economic advantage

Count Five alleges that by falsely accusing Barrett of assault, Villar tortiously interfered with Barrett's prospect of economic advantage, *i.e.*, his continued employment with Walgreens.

An at-will employee may possess a protectable expectation of economic advantage; the element of economic advantage is not necessarily based on a contract. The employee need only show that "there was a reasonable probability that he or she would have received the anticipated economic benefit." *Cataldo v. Moses*, No. A-4943-04T3, 2006 WL 1450382, at *11 (N.J. Super. Ct. App. Div. May 26, 2006) (reversing a trial court's finding that the plaintiff's tortious interference claim must be dismissed because the plaintiff was an at-will employee). A reasonable jury could find that Barrett's lengthy employment history with Walgreens gave him an expectation of a continued economic benefit. A third party's interference with such an economically advantageous employer/employee relationship is therefore potentially tortious.

Special considerations apply, however, where the third-party defendant is a fellow employee. If the defendant employee was acting within the scope of employment, New Jersey law bars a tortious interference claim.[5] If, on the

---

[5] *DiMaria Const., Inc. v. Interarch*, 799 A.2d 555, 561 (N.J. App. Div. 2001) *aff'd*, 172 N.J. 182, 797 A.2d 137 (2002) (noting that a "clear-cut consensus has emerged that if an employee or agent is acting on behalf of his or her employer or principal, then no action for tortious interference will lie."); *Sun Pharm. Indus., Inc. v. Core Tech*

16

other hand, the defendant employee was *not* acting within the scope of employment, that employee can be liable.[6]

The rationale is as follows: Tortious interference is a third-party tort; a party cannot, for example, tortiously interfere with that party's own contract. The acts of an employee within the scope of employment are deemed to be the acts of the employer. The employer, however, is a party to the economically advantageous relationship. Therefore an employee, if acting on the employer's behalf, cannot tortiously interfere with a co-employee's economic relationship with their mutual employer. *Michelson v. Exxon Research and Engineering Co.*, 808 F.2d 1005, 1007-08 (3d Cir. 1987) (addressing the same issue with respect to Pennsylvania law). A defendant acting outside the scope of employment, however, is treated as a third party to the employer/employee relationship. Such a defendant, like any other third party, is potentially liable for tortious interference.

Thus, to the extent that Villar acted outside the scope of his employment, he is potentially liable for tortious interference. But to the extent he acted within the scope of his employment, he cannot be liable.

### A. Scope of employment

Whether a defendant employee acted within the scope of employment tends to be fact-specific. In *DiMaria Construction, supra*, the court explained that an employee's speech "falls outside the scope of the privilege if he or she acts for personal motives, out of malice, beyond his or her authority, or

---

*Solutions, Inc.*, No. A-0646-11T4, 2013 WL 1942619, at *19 (N.J. Super. Ct. App. Div. May 13, 2013); *Vosough v. Kierce*, 97 A.3d 1150, 1160 (N.J. App. Div. 2014); *Manning v. Lithium Tech. Corp.*, No. A-2389-10T4, 2011 WL 6260632, at *5 (N.J. Super. Ct. App. Div. Dec. 16, 2011); *Swift v. United Food Commercial Workers Union Local 56*, No. A-2612-06T1, 2008 WL 2696174, at *5 (N.J. Super. Ct. App. Div. July 11, 2008).

6    *DiMaria Const.*, 799 A.2d at 561 (holding that if "the employee or agent is acting outside the scope of his or her employment or agency, then an action for tortious interference will lie."). *See also Varrallo v. Hammond Inc.*, 94 F.3d 842, 849 n. 11(3d Cir. 1996) ("an employee who acts for personal motives, out of malice, beyond his authority, or otherwise not in good faith in the corporate interest falls outside the scope of the privilege.").

otherwise not in good faith in the corporate interest." 799 A.2d at 561; see also *McAbee v. Univ. of Med. & Dentistry of New Jersey Sch. of Osteopathic Med.*, No. A-5771-09T1, 2012 WL 2428126, at *7 (N.J. Super. Ct. App. Div. June 28, 2012) (invoking the same standard). In *Swift, supra*, the Court analogized to the test for scope of employment in the context of respondeat superior. *Swift* instructs courts to consider whether an act or statement is "so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." 2008 WL 2696174 at *5.

A good-faith complaint of physical assault might easily fall within the scope of Villar's employment. The alleged conduct occurred at work, during work hours, between on-duty employees. Reporting misconduct in the workplace is expected, even required, by employers.

If, on the other hand, Villar's accusations of assault are not true, a reasonable jury could conclude that he acted outside the scope of his employment. A fabricated report of an assault might easily be an act taken "for personal motives, out of malice, beyond [Villar's] authority, or otherwise not in good faith in the corporate interest." *DiMaria, supra*.

As discussed above, there is a material issue of fact as to whether the July 12, 2012 assault occurred at all. It follows that there is also a material issue of fact as to whether Villar, in lodging his complaint, was acting within the scope of his employment. And that issue, in turn, may determine whether Villar can be liable for tortious interference with economic advantage. That issue—and there may be others— is enough to require that the case be tried.

Villar's motion for summary judgment is therefore DENIED as to Count Five.

## VI. Sanctions

The defendants' motion for summary judgment also includes an application for Rule 11 sanctions against Barrett's counsel. (Mot., 14-18).[7] Sanctions under FED. R. CIV. P. 11(c)(2) are reserved for extreme conduct. "We caution litigants that Rule 11 is not to be used routinely when the parties disagree about the correct resolution of a matter in litigation." *Morristown Daily Record, Inc. v. Graphic Commc'ns Union, Local 8N*, 832 F.2d 31, 32 n.1 (3d Cir. 1987). A motion for sanctions is not appropriate merely because a litigant's complaint is weak. Rather, sanctions are appropriate only "where a claim or motion is patently unmeritorious or frivolous." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 289 (3d Cir. 1991). Two counts of Barrett's complaint survived defendants' summary judgment motion. The other three, after development in discovery, did not. Taken as a whole, however, they are not so frivolous or unsupported as to merit sanctions. The motion for sanctions is DENIED.

### Conclusion

The defendants' motion for summary judgment will be GRANTED as to Counts One, Two, and Three, which are asserted against Walgreens, and DENIED as to Counts Four and Five, which are asserted against Villar. The defendants' motion for sanctions will be denied. A separate order will issue.

Dated: March 6, 2015
Newark, New Jersey

Kevin McNulty
United States District Judge

---

[7] Rule 11(b), requires that a separate motion be served, but not filed until a 21-day cure period has passed. Back on May 29, 2013, defendants made a Rule 11 demand by letter that the action be withdrawn. (ECF 20-7) It refers to the "Amended Complaint"; the reference may be to a proposed pleading, because the motion to file the Amended Complaint containing the claims against Villar had not yet been filed. (*See* ECF 9 (5/10/2013).)

19